855 F.2d 1510
 129 L.R.R.M. (BNA) 2539, 57 USLW 2211,
57 USLW 2217,
109 Lab.Cas. P 10,742,
4 Indiv.Empl.Rts.Cas. 111
 Calvin L. PARKER; Gene A. Childers; Maple L. Copeland;
Will Goodman; Nathaniel Grant; Thomas Ray Loveless; Ruben
I. Pierce; Joe D. Pressley; Virgil Lee Weatherspoon, on
their own behalf and on behalf of all other hourly wage
employees of Connors Steel Company similarly situated, and
as representatives of a class of persons consisting of those
employees who on or after June 1, 1982, were employed as
hourly wage earners by Connors Steel Company and represented
by the United Steelworkers of America, AFL-CIO and its Local
Union No. 2250, Plaintiffs-Appellants,
v.
CONNORS STEEL COMPANY; H.K. Porter Company, Inc.; and
United Steelworkers of America, AFL-CIO, CLC,
Defendants-Appellees,
Carl L. Statum; Tom Kimbrell; and James E. Norman, Defendants.
 No. 87-7607.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 29, 1988.
 
 W. Eugene Rutledge, Rutledge & Kelly, P.C., Kay S. Kelly, Birmingham, Ala., for plaintiffs-appellants.
 Franklin G. Shuler, Jr., Cooper, Mitch, Crawford & Kuykendall, Jerome A. Cooper, Birmingham, Ala., for United Steelworkers of America, AFL-CIO-CLC.
 Harry L. Hopkins, Lange, Simpson, Robinson & Somerville, Duncan B. Blair, Birmingham, Ala., for Connors Steel Co. & H.K. Porter Co., Inc.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before HATCHETT and COX, Circuit Judges, and FLOYD R. GIBSON*, Senior Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge:
 
 
 1
 Appellants, former employees of Connors Steel Company (Connors) and putative class representatives of approximately 600 former Connors employees, appeal an order of the district court granting summary judgment to Connors, H.K. Porter Company, Inc. (H.K. Porter), and United Steelworkers of America, AFL-CIO, CLC (Union), in this complicated dispute which followed the closing of Connors's steel plant in Birmingham, Alabama. The employees sued Connors, its parent corporation H.K. Porter (Connors and H.K. Porter are collectively referred to as the "Company"), and the Union alleging fraud, a hybrid Sec. 301/fair representation claim, breach of the duty of fair representation, and breach of a collective bargaining agreement (CBA or agreement) and two concession agreements.
 
 
 2
 The district court concluded that the state law fraud claims were preempted by sections 7 and 8 of the National Labor Relations Act (NLRA or Labor Act). The district court also determined that there were no genuine issues of material fact and that the Union was entitled to summary judgment on the fair representation claim by the former employees as a matter of law. Finding that the Company's liability under section 301 of the Labor Management Relations Act (LMRA) was conditional on the Union's breaching its duty of fair representation, the district court granted the Company's motion for summary judgment. We affirm.
 
 BACKGROUND
 
 3
 This case arose out of two concession agreements given by the employees to the Company which provided for an emergency reduction in wages and benefits. The first concession agreement became effective on September 1, 1982 and reduced wages by twenty percent, reduced certain benefits, and provided for complete repayment of all wage and benefit concessions if Connors returned to profitability. Connors required the concessions to keep its Birmingham[1] plant open because it was facing vigorous competition in the reinforcing steel bar market from "mini-mills" and had incurred $1,594,000 in losses during the first five months of 1982.
 
 
 4
 Connors believed that given its staggering losses H.K. Porter would close the Birmingham plant if the workers did not approve the concessions. The Union met with Connors's representatives and based on its review of Connors's financial records it decided to recommend the concession package to its membership. The Union membership subsequently approved the concession agreement.
 
 
 5
 Losses at Connors continued to mount despite the implementation of the concession agreement and the relief it provided. By the end of 1982 Connors's yearly losses exceeded $9,000,000.
 
 
 6
 In January 1983 negotiations began on a second concession agreement which was ratified by the union membership[2] and went into effect on February 27, 1983. The concessions included a reduction of hourly wages by twenty percent, elimination of supplemental unemployment contributions, savings and vacation benefits, Sunday premiums, shift differentials, and vision and dental benefits. The second package of concessions seemed to reverse the trend of mounting losses. In February 1983 Connors lost $1,010,000 and this monthly loss declined in the following months to $90,000 by August 1983.
 
 
 7
 The CBA, as modified by the two concession agreements, was set to expire on September 1, 1983, so Connors began negotiating with the Union on a new agreement to become effective upon the expiration of the prior agreement. Connors's final proposal for a new agreement was rejected by the union membership on August 8, 1983. The following day Connors gave the Union notice that the plant would close on September 1. Connors and the Union agreed that, pursuant to the grievance and arbitration provisions of the CBA, all differences between the parties with respect to payment of benefits upon plant closure would be resolved through arbitration.
 
 
 8
 In October 1983 a group of former Connors employees met to discuss the benefits that Connors proposed to pay them as a result of the plant closure. Seven grievances were prepared complaining that: vacation pay had not been fully paid; all employees at closing were entitled to layoff status and the benefits resulting therefrom; and the employees should be paid the value of the benefits given up in the concession agreements. Connors and the Union agreed to present these grievances to an arbitrator for resolution along with the other issues that they had already agreed to arbitrate.
 
 
 9
 Prior to the arbitration hearing the employees filed two unfair labor practice charges with the National Labor Relations Board (NLRB or Board). The employees alleged that Connors had bargained in bad faith in violation of section 8(a)(5) of the NLRA and that the Union violated its duty of fair representation under section 8(b) of the Act. Shortly after the charges were filed the Board informed the employees that the charges had been investigated but further proceedings were not warranted because the charges were not filed within section 10(b)'s six month limitations period. The employees appealed the dismissal of the charges to the NLRB General Counsel, but the appeal was denied.
 
 
 10
 The employees then filed this lawsuit in Alabama state court alleging: 1) various breaches of the Union's duty of fair representation; 2) a breach of the CBA and concession agreements by Connors; and 3) fraud and bad faith against the Company in negotiating and inducing the employees to ratify the two concession agreements. The case was then removed to federal court.
 
 
 11
 After the case was removed the arbitration hearing took place. The arbitrator was presented with all disputes between Connors and the Union including the seven grievances filed by the employees. The arbitrator issued a forty-three page decision finding in favor of the Union on two of the grievances. Connors then complied with the arbitrator's award by issuing checks to 586 former employees totaling $243,392.66.
 
 
 12
 Thereafter, the district court granted Connors, H.K. Porter, and the Union summary judgment. The court concluded that the employees' state law fraud claims were preempted by sections 7 and 8 of the NLRA. The court dismissed the fair representation claims against the Union finding that "[n]either ineffectiveness nor ineptitude gives rise to a claim for breach of this duty." Finally, the district court granted summary judgment to Connors and H.K. Porter because their liability for breach of the CBA under Sec. 301 was conditional on a finding that the Union breached its duty of fair representation.
 
 DISCUSSION
 
 13
 This case is unique because the employees are seeking redress for claims that have already been the subject of an arbitration proceeding and presented to the NLRB as unfair labor practices. Because the employees received only a partial award in the arbitration proceeding and because the NLRB dismissed their unfair labor charges, the employees turned to state court to pursue relief based primarily on state tort theories. The case was removed and decided on the Company and Union's motions for summary judgment. Now on appeal we are faced with the following questions: 1) the significance of the arbitration award on the claims raised by the employees; 2) the significance of the NLRB's dismissal of the unfair labor practice charges filed by the employees; 3) whether the employees' claims are preempted by sections 7 and 8 of the NLRA or section 301 of the LMRA; and finally, we must determine whether the district court was correct when it granted summary judgment dismissing the employees' claims of breach of the duty of fair representation by the Union and breach of the CBA by the Company.[3]
 
 A. State Law Fraud Claims
 
 14
 The crux of the employees' state law fraud claims is that the Company fraudulently obtained the 1982 and 1983 concession agreements by representing that it would keep the Birmingham steel plant open if the employees granted the concessions. The employees also allege that the Company intended to close the plant from the very beginning and obtained the concessions in order to reduce the costs associated with the plant closing.
 
 
 15
 The district court concluded that the claims were nothing more than allegations that the Company failed to bargain in good faith and thus the claims were arguably within the exclusive jurisdiction of the NLRB.[4] Therefore, the district court concluded that the claims were preempted by sections 7 and 8 of the Labor Act citing San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In Garmon the Supreme Court stated:
 
 
 16
 When an activity is arguably subject to Sec. 7 or Sec. 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.
 
 
 17
 Id. at 245, 79 S.Ct. at 779.
 
 
 18
 Thus, the employees' state fraud claims are preempted if they touch upon an activity that is arguably protected or prohibited by the Labor Act.
 
 
 19
 In Serrano v. Jones & Laughlin Steel Co., 790 F.2d 1279 (6th Cir.1986), the Sixth Circuit was faced with a similar situation. In that case Jones & Laughlin Steel Co. (J & L), also confronted with the recession in the steel industry, negotiated a concession agreement allowing it to depart from the basic collective bargaining agreement. The concession agreement, which was signed in July 1981, was entered in an effort to avoid a shutdown of one of J & L's coke plants. Nevertheless, the plant was closed and the Union filed a grievance which was not pursued through the various steps provided in the CBA. After the Union terminated the grievance without pursuing arbitration, the employees filed an action in Ohio state court which was then removed to federal court. The employees raised state law fraud claims similar to those raised by the employees in the instant case. They alleged that despite J & L's representations that it intended to rebuild its coke facilities if certain concessions were made by the J & L employees, it actually intended to rebuild the facilities only if it could obtain an extension of time within which to comply with Clean Air Act requirements.
 
 
 20
 The court in Serrano was presented the same arguments that have been presented in the instant case. The employees argued that the fraud claims were not preempted because the controversy presented under state law was not identical to that which could have been presented to the NLRB. Furthermore, the claims come within an exception to the preemption doctrine as claims that touch interests so deeply rooted in local feeling and responsibility that no congressional intent to preempt can be inferred.
 
 
 21
 The Serrano court first concluded that the Garmon preemption doctrine applied because the state fraud claims touched upon activity which was arguably prohibited by the Labor Act. Specifically, the Sixth Circuit determined that if the employees' allegations were true, J & L's conduct would be prohibited by section 8(d) of the Labor Act which requires an employer to bargain in good faith "with respect to wages, hours, and other terms and conditions of employment ..." 29 U.S.C. Sec. 158(d).
 
 
 22
 No matter how it is stated, the gravamen of the three fraud charges is that J & L did not bargain in good faith in obtaining concessions from the Union in the July agreement. To the extent that plaintiffs claim fraud unrelated to the July agreement, the same principles apply.... [W]hether classified as a violation of the general duty to bargain in good faith or the more particular duty to bargain over the effects of a plant closure, the conduct about which plaintiffs are complaining was arguably a violation of section 8.
 
 
 23
 Serrano, 790 F.2d at 1286-87.
 
 
 24
 The same principles and analysis apply to the instant case. The displaced Connors employees raise claims that are in substance allegations that the Company breached its duty to bargain in good faith in negotiating the concessions and in failing to reveal the likelihood of a plant closure despite the concessions. These are the types of claims to which the Garmon preemption doctrine was intended to apply.
 
 
 25
 In Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 197, 98 S.Ct. 1745, 1757, 56 L.Ed.2d 209 (1978), the Supreme Court stated that:
 
 
 26
 The critical inquiry [in the Garmon analysis] is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to (as in Garner ) or different from (as in Farmer ) that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the Garmon doctrine was designed to avoid.
 
 
 27
 Further, we note that the Garmon preemption doctrine is premised, in part, on what the Supreme Court has termed notions of "primary jurisdiction." Id. at 199, 98 S.Ct. at 1758. " '[P]rimary jurisdiction' is used to refer to the various considerations articulated in Garmon and its progeny that militate in favor of pre-empting state-court jurisdiction over activity which is subject to the unfair labor practice jurisdiction of the federal Board." Id. at n. 29, 98 S.Ct. at 1758 n. 29. The Court explained that the primary jurisdiction rationale justifies preemption only in situations in which an aggrieved party has a reasonable opportunity either to invoke the Board's jurisdiction himself or to induce his adversary to do so. "The primary-jurisdiction rationale unquestionably requires that when the same controversy may be presented to the state court or the NLRB, it must be presented to the Board." Id. at 202, 98 S.Ct. at 1760.
 
 
 28
 We believe that the Supreme Court's primary jurisdiction rationale also requires preempting the employees' state law fraud claims. The employees filed two unfair labor practice charges with the NLRB which were later dismissed[5] and an appeal denied by the General Counsel. Consequently, the employees, through artful drafting, have recast the same claims and factual allegations into state law fraud claims. We believe that the primary jurisdiction rationale has the greatest validity when a party has sought redress for his claims from the NLRB and in the face of an adverse decision the claims are restructured as state law claims and pursued in state court. Cf. Communications Workers v. Beck, --- U.S. ----, ----, 108 S.Ct. 2641, 2646-48, 101 L.Ed.2d 634 (1988) ("Employees, of course, may not circumvent the primary jurisdiction of the NLRB simply by casting statutory claims as violations of the union's duty of fair representation."). By initially pursuing relief with the NLRB the employees have implicitly recognized the Board's jurisdiction over their claims.
 
 
 29
 Further, we do not believe that the employees' claims bring this case within any of the recognized exceptions to the Garmon preemption doctrine.
 
 
 30
 In Garmon the Supreme Court recognized several exceptions to preemption. Relevant in this appeal are the exceptions for cases involving compelling state or local interests and cases where the issues involved are of peripheral concern to the purposes of the Labor Act. The employees argue that both exceptions apply to this case.
 
 
 31
 The first exception applies "where the regulated conduct touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we [can] not infer that Congress ha[s] deprived the States of the power to act." Garmon, 359 U.S. at 244, 79 S.Ct. at 779 (footnote omitted); Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Lockridge, 403 U.S. 274, 297, 91 S.Ct. 1909, 1923, 29 L.Ed.2d 473 (1971) [hereinafter Motor Coach Employees ].
 
 
 32
 When the activity in question is traditionally subject to state regulation, then the Court has utilized a flexible approach giving due consideration to the state's interests. Sears, Roebuck & Co., 436 U.S. at 187-88, 98 S.Ct. at 1752-53. Consistent with this decision we have balanced Alabama's interest in protecting its citizens from the challenged conduct against the risk of interference with the regulatory jurisdiction of the NLRB. In cases where, as here, the substance of the dispute is the same under both state and federal law, the state law must yield to the jurisdiction of the NLRB. Cf. Lumber Production Industrial Workers Local # 1054 v. West Coast Industrial Relations Assoc., Inc., 775 F.2d 1042, 1048 (9th Cir.1985) ("[I]f a crucial element of a state court action is identical to an element of an unfair labor practice that is arguably covered by the NLRA, then the state action is preempted."). We believe that allowing state law fraud claims for conduct that would also be a violation of the employer's duty to bargain in good faith would necessarily undermine the Board's exclusive jurisdiction and may subject the employer to conflicting substantive rules. See Local 926, International Union of Operating Engineers v. Jones, 460 U.S. 669, 676, 103 S.Ct. 1453, 1458-59, 75 L.Ed.2d 368 (1983) [hereinafter Operating Engineers ]; Motor Coach Employees, 403 U.S. at 292, 91 S.Ct. at 1920-21 ("Pre-emption ... is designed to shield the system from conflicting regulation of conduct."). Further, the state's interest in protecting its citizens from fraud and misrepresentations does not outweigh our concern in protecting the NLRB's jurisdiction from erosion through state regulation. Serrano, 790 F.2d at 1287-88. Thus, the balancing of local interests against the regulatory scheme established by Congress compels preemption.
 
 
 33
 The employees argue that the Supreme Court's decision in Belknap, Inc. v. Hale, 463 U.S. 491, 510, 103 S.Ct. 3172, 3183, 77 L.Ed.2d 798 (1983) (dealing with rights of discharged replacement employees) removes their state law claims of fraudulent misrepresentation and breach of contract from Garmon preemption. We disagree. The Sixth Circuit rejected this same argument in Serrano noting that Belknap was distinguishable because the dispute presented to the state court was not identical to the dispute which could have been presented to the Board. In the instant case, however, the substance of the employees' labor charge and their state fraud claims are identical. The facts and allegations of both claims are also identical. In such circumstances it would not be proper to allow the employees to escape the Garmon preemption doctrine through artful drafting. Motor Coach Employees, 403 U.S. at 292, 91 S.Ct. at 1920-21 ("It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern.").
 
 
 34
 The second exception argued by the employees allows states to regulate conduct that is only of peripheral concern to the Labor Act. Operating Engineers, 460 U.S. at 676, 103 S.Ct. at 1458-59. This exception, however, has no applicability to the instant case.
 
 
 35
 As noted in Serrano, "[f]ailure of an employer to bargain in good faith about terms and conditions of employment is not peripheral to the concerns of federal labor law; rather, it strikes at the heart of one of the basic concerns of that law." 790 F.2d at 1287. Good faith bargaining is a core concern of the Labor Act, not a matter of only peripheral concern. Eroding the Board's jurisdiction over claims involving a failure to bargain in good faith will inevitably eviscerate the Labor Act and all that it has accomplished. Consequently, we do not believe that the employees' claims fit into any recognized exception to the Garmon preemption doctrine.
 
 
 36
 B. Fair Representation and Breach of Contract Claims
 
 
 37
 The employees appear to be raising several claims involving the conduct between the Union and the Company. The claims appear to be as follows: 1) a hybrid Sec. 301/fair representation claim against the Union and the Company; 2) a separate claim against the Union for breach of the duty of fair representation in the ratification of the concession agreements and in the Union's handling of their grievances; and 3) a separate claim against the Company for breach of the CBA and the concession agreements. We believe that the first two claims fail because the evidence does not establish a breach of the duty of fair representation by the Union and because the employees have failed to establish a genuine issue of material fact that would preclude summary judgment.
 
 
 38
 In DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court discussed the nature of a hybrid Sec. 301/fair representation claim as follows:
 
 
 39
 Such a suit, as a formal matter, comprises two causes of action. The suit against the employer rests in Sec. 301, since the employee is alleging a breach of the collective-bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. "Yet the two claims are inextricably interdependent. 'To prevail against either the company or the Union, ... [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union.' " ... The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both. The suit is thus not a straightforward breach-of-contract suit under Sec. 301, ... but a hybrid Sec. 301/fair representation claim, amounting to "a direct challenge to 'the private settlement of disputes under [the collective-bargaining agreement].' "
 
 
 40
 Id. at 164-65, 103 S.Ct. at 2290-91 (citations omitted).
 
 
 41
 The district court determined that the evidence did not support the employees' claim that the Union breached its duty of fair representation and thus their hybrid Sec. 301/fair representation claim failed as a matter of law.
 
 
 42
 The district court granted the Union and the Company summary judgment concluding that the Company's liability under this claim was conditioned on a finding that the Union breached its duty of fair representation. We agree with the district court's analysis. The above quote from DelCostello makes it clear that the claims against the Union and the Company are interdependent and in order to prevail the employee must satisfy his burden of proving a breach of contract by the Company and a breach of the Union's duty of fair representation.
 
 
 43
 The employees claim that the Union breached its duty of fair representation in the negotiation of the two concession agreements. As we shall discuss further below, this claim fails because mere negligence in negotiations does not amount to a breach of the union's duty.
 
 
 44
 In International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979), the Supreme Court broadly characterized the duty of fair representation: "Under the doctrine, a union must represent fairly the interests of all bargaining-unit members during the negotiation, administration, and enforcement of collective-bargaining agreements." Id. at 47, 99 S.Ct. at 2125 (emphasis added). See also Communications Workers v. Beck, --- U.S. at ----, 108 S.Ct. at 2646-48 ("This jurisdiction to adjudicate fair representation claims encompasses challenges leveled not only at a union's contract administration and enforcement efforts, ... but at its negotiation activities as well.") (citations omitted).
 
 
 45
 The employees allege that the Union breached its duty of fair representation in the negotiation of the concession agreements, in processing their grievances, and in obtaining ratification of the concession agreements. The nature of the duty of fair representation which a Union owes its members is determined by considering the context in which the duty is asserted. Thus, the duty of fair representation in the context of negotiations may be determined by a different standard than is the duty owed in the processing of grievances or ratification of the concession agreements. 2 The Developing Labor Law 1321 (C. Morris 2d ed. 1983) [hereinafter Labor Law ] (Neither the courts nor the Board have "articulated clear distinctions defining the duty in relation to the particular aspect of union representation which is being challenged.").
 
 
 46
 A violation of the Union's duty of fair representation in the context of negotiations with the Company is established if the Union's conduct in negotiations is arbitrary, irrational, or undertaken in bad faith. See, e.g., Hendricks v. Airline Pilots Ass'n Intern., 696 F.2d 673, 678 (9th Cir.1983). The Supreme Court discussed the Union's duty in the context of negotiations as follows:
 
 
 47
 Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented. A major responsibility of negotiators is to weigh the relative advantages and disadvantages of differing proposals.
 
 
 48
 * * *
 
 
 49
 The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.
 
 
 50
 Ford Motor Co. v. Huffman, 345 U.S. 330, 337-38, 73 S.Ct. 681, 685-86, 97 L.Ed. 1048 (1953).
 
 
 51
 Applying these standards, we do not believe that the employees have sustained their burden of showing a breach of the Union's fair representation duties in the negotiation process. A union cannot ensure job security when economic conditions make it unprofitable to keep a plant operating. Likewise, a company is not required to keep a plant operating after a CBA has expired[6] and the company is not obligated to enter a new CBA.[7] The Union was faced with threats of plant closure by the Company if concessions were not given. Now, after ratifying these very concessions, the employees attempt to hold the Union accountable. We do not believe that under these circumstances the Union breached its duty of fair representation in its negotiation of the concession agreements, but, to the contrary, it appears that the Union officials did the best they could under difficult conditions, including imminent closure of the plant. See Dwyer v. Climatrol Industries, Inc., 544 F.2d 307, 311 (7th Cir.1976) (union did not breach duty of fair representation in negotiating plant closedown agreement), cert. denied, 430 U.S. 932, 97 S.Ct. 1553, 51 L.Ed.2d 776 (1977).
 
 
 52
 In the context of grievance processing, in order to establish that the union has breached its duty of fair representation the employee must show that the union's handling of the grievance was either arbitrary, discriminatory, or done in bad faith. Harris v. Schwerman Trucking Co., 668 F.2d 1204, 1206 (11th Cir.1982); see also Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916-17, 17 L.Ed.2d 842 (1967). An example would be when a union arbitrarily ignores a meritorious grievance or is perfunctory in its processing of the grievance. Id.
 
 
 53
 We note that a union is allowed considerable latitude in its representation of employees. The grievance and arbitration process is not conducted in a judicial forum and union representatives are not held to strict standards of trial advocacy.... * Cases are uniform in holding that neither negligence on the part of the union nor a mistake in judgment is sufficient to support a claim that the union acted in an arbitrary and perfunctory manner.
 
 
 54
 Harris, 668 F.2d at 1206 (citations omitted).
 
 
 55
 In the present case the employees have failed to create a genuine factual dispute with respect to the grievance procedure and the Union's handling of their grievances. The employees' claim is without merit. It is ironic that the employees challenge the Union's processing of their grievances notwithstanding the fact that the Union pursued all of their grievances through arbitration and received an award on two of the grievances presented to the arbitrator.
 
 
 56
 The employees argue that the Union's conduct in seeking ratification of the concession agreements also violated its duty of fair representation. See, e.g., Bautista v. Pan American World Airlines, Inc., 828 F.2d 546, 550 (9th Cir.1987) (duty of fair representation encompasses a Union's conduct in seeking employee ratification of CBA); Anderson v. United Paperworkers International Union, 641 F.2d 574, 578 (8th Cir.1981); DeBoles v. Trans World Airlines, Inc., 552 F.2d 1005, 1018 (3d Cir.), cert. denied, 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). While we agree that in an appropriate case a fair representation claim may be stated against a union for misrepresenting the terms of an agreement to its membership, we do not believe that in the present case the Union has breached any duty it owes the employees it represents. In the letter urging ratification of the concession agreements the Union accurately reflected its negotiation efforts with the Company and the economic crisis in the steel industry. The employees have failed to show any misrepresentation made by the Union in obtaining ratification of the concession agreements.
 
 
 57
 Taking the facts in the light most favorable to the employees the Union's conduct in this case was negligent at most. Rollins v. Techsouth, Inc., 833 F.2d 1525, 1528 (11th Cir.1987) ("In determining whether a factual issue exists, a court must consider all the evidence in the light most favorable to the non-moving party."). Negligence, however, is not enough to sustain a claim for breach of the duty of fair representation in any context. The only thing that the federal courts seem to be in agreement on with respect to the duty of fair representation is that mere negligence is not a breach of this duty. See Higdon v. United Steelworkers of America, 706 F.2d 1561, 1562 (11th Cir.1983) (per curiam); Harris, 668 F.2d at 1206.
 
 
 58
 Because the employees have failed to show any facts to support their claims that the Union breached its duty of fair representation in the negotiation process, in its handling of their grievances, or in the ratification of the concession agreements, the employees' hybrid Sec. 301/fair representation claim and their separate claim for breach of the Union's duty of fair representation must fail. The hybrid Sec. 301/fair representation claim against the Company and Union fails because a crucial element of such a claim is a breach of the union's duty of fair representation.
 
 
 59
 We now address the employees' separate claim against the Company for breach of contract. The employees claim that the Company breached provisions contained in the CBA and the concession agreements. As noted previously, the district court concluded that "H.K. Porter and Connors [were] also entitled to summary judgment, their liability under Section 301 being conditional upon the union's breaching its duty of fair representation." The grievance and arbitration clause in the CBA required mandatory arbitration over "any question relating to wages, hours of work, and other conditions of employment or any change therein." It also provided that the decision of the arbitrator would be the final decision on the merits of the grievance. We conclude that the scope of the grievance and arbitration clause was broad enough to include all of the employees' breach of contract claims, and that all such claims should have been submitted for arbitration. The employees, therefore, cannot prevail on their claims against the Company absent a showing that the Union breached its duty of fair representation, DelCostello, supra, or that the arbitration award is not final because of misconduct on the part of the Union in the arbitration process. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567, 96 S.Ct. 1048, 1057-58, 47 L.Ed.2d 231 (1976); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); Harris, 668 F.2d at 1206. The employees have not challenged the validity of the award and therefore their claim is barred because the CBA provides that the decision of the arbitrator shall be final.
 
 C. The Arbitration Award
 
 60
 We also believe that the employees are barred from raising their state fraud claims in federal court because of the finality of the arbitration award pursuant to the CBA.
 
 
 61
 The Company argues that because the employees' claims were the subject of arbitration the claims have merged with the arbitration award and are thus barred. The district court made no finding as to whether all of the claims presented to it had been presented to the arbitrator. We need not decide precisely which claims were presented to the arbitrator, because it is clear that all claims involving the CBA and the concession agreements, whether they be denoted as state fraud claims or breach of contract claims, should have been presented to the arbitrator under the terms of the CBA.
 
 
 62
 In Mason v. Continental Group, Inc., 763 F.2d 1219 (11th Cir.1985), cert. denied, 474 U.S. 1087, 106 S.Ct. 863, 88 L.Ed.2d 902 (1986), this court was faced with a similar case. In Mason, former employees of the Continental Can Company claimed that the company closed its Alabama plant in order to avoid employment obligations to its employees after having induced the employees to continue working on the representation that the plant would remain open. The employees brought claims against the company and their union very similar to the claims raised in the present case. This court rejected the employees' argument that "since a decision to shut down a plant for economic reasons does not fall within an arbitration clause covering 'wages, hours, and conditions of employment' ... a cause of action for fraudulent concealment and misrepresentation of that decision would not be covered." Id. at 1224 (citations omitted). The Mason court noted that "[h]aving agreed to such a broad arbitration clause, plaintiffs are bound to submit arguably extrinsic claims, such as fraud, to the grievance and arbitration process." Id. at 1223. The same is true with the fraud claims raised by the employees in the instant case.
 
 
 63
 The CBA in the present case contained a provision for the adjustment of complaints and grievances. Section 9C of the agreement provided:
 
 
 64
 Should differences arise between the Company and the Union as to the interpretation or application of or compliance with the provisions of this Agreement or as to any question relating to the wages, hours of work and other conditions of employment or any change therein ... an earnest effort shall be made to settle the matter promptly in accordance with the following procedure.... [emphasis added].
 
 
 65
 In United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1352-53, 4 L.Ed.2d 409 (1960), the Supreme Court determined that "[a]n order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Thus, the Supreme Court endorses an expansive reading of arbitration clauses and espouses a "presumption of arbitrability." 1 Labor Law, at 881.
 
 
 66
 The Mason decision coupled with the Supreme Court's "presumption of arbitrability" convinces us that all of the employees' claims, including fraud claims, should have been submitted to arbitration, and that they are barred for this reason, whether or not they were actually submitted.
 
 D. Recusal
 
 67
 After the district court issued its decision, the employees filed a motion requesting the district judge to recuse himself from the case. The memorandum opinion issued by the district court contained a footnote that reads in relevant part:
 
 
 68
 For the formulation of this opinion, the Court is indebted to its Law Clerk, William G. Somerville, III, for his careful analysis of the massive discovery materials and his countless discussions with the Court as to how the law should be applied to the material facts as to which there is no genuine issue.[8]
 
 
 69
 The employees argue that the district judge was required to recuse himself because his law clerk, William G. Somerville, III, was the son of William G. Somerville, Jr.,[9] a partner in the law firm of Lange, Simpson, Robinson & Somerville, the firm representing Connors and H.K. Porter. The employees also allege that Somerville's participation in the decisional process was critical to the court's decision because it was Somerville who reviewed the voluminous discovery documents and determined that there were no material issues of fact that would prevent summary judgment disposition of the case.[10] Additionally, the employees allege that Somerville actually held a hearing with counsel in the absence of the district judge and later reported the results of the hearing to the judge. The employees argue that these circumstances violate 28 U.S.C. Sec. 455 and thus require this court to reverse and reassign this case to another judge.
 
 
 70
 The Supreme Court very recently discussed Sec. 455(a) and its goal of promoting public confidence in the integrity of the judicial process. In Liljeberg v. Health Services Acquisition Corp., --- U.S. ----, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), the Supreme Court held that scienter is not required in order to find a violation of Sec. 455(a). The Supreme Court stated:
 
 
 71
 The judge's lack of knowledge of a disqualifying circumstance may bear on the question of remedy, but it does not eliminate the risk that 'his impartiality might reasonably be questioned' by other persons.... Moreover, advancement of the purpose of the provision--to promote public confidence in the integrity of the judicial process, ... does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew.
 
 
 72
 Id. --- U.S. at ----, 108 S.Ct. at 2202-03 (citations omitted).
 
 
 73
 Inherent in Sec. 455(a)'s requirement that a judge disqualify himself if his impartiality might reasonably be questioned is the principle that our system of "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954). "The very purpose of Sec. 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." Liljeberg, --- U.S. at ----, 108 S.Ct. at 2203-05.
 
 
 74
 Thus, section 455(a) embodies an objective standard. The test is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality. See Potashnick v. Port City Const. Co., 609 F.2d 1101, 1111 (5th Cir.), cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980).[11]
 
 
 75
 We now turn to the objective facts that might reasonably cause an objective observer to question Judge Lynne's impartiality. First, the close familial relationship between Judge Lynne's law clerk and a senior partner in the firm representing Connors and H.K. Porter might lead an objective observer, especially a lay observer,[12] to believe that Connors and H.K. Porter will receive favorable treatment from the district judge. This is compounded by the observation that William G. Somerville, Jr., is a former law clerk to Judge Lynne.[13]
 
 
 76
 Judge Lynne's practice of giving credit to his law clerk in a footnote may erroneously lead some to believe that the law clerk decided the case. While it has not been suggested that the decision in this case was made by Judge Lynne's law clerk and we have no reason to believe that it was, it is not unreasonable to believe that the public may come to this conclusion. See, e.g., Acceptance Ins. Co. v. Schafner, 651 F.Supp. 776, 778 (N.D.Ala.1986) ("This Memorandum of Opinion was prepared by William G. Somerville, III, Law Clerk, in which the Court fully concurs.") (emphasis added); Cone v. The Florida Bar, 626 F.Supp. 132, 137 (M.D.Fla.1985) (Judge Lynne, sitting by designation) ("This opinion is the product of exhaustive research and careful analysis by Luther M. Dorr, Jr., Law Clerk."). It goes without saying that it would be improper for a judge to delegate the adjudicative function of his office to one that was neither appointed by the President nor confirmed by the Senate.
 
 
 77
 Finally, we believe that when Somerville held a hearing in Judge Lynne's absence and later reported the results of the hearing to the judge this contributed to the appearance of impropriety.[14]
 
 
 78
 We believe that these facts might cast doubt in the public's mind on Judge Lynne's ability to remain impartial and at a minimum these facts raise the appearance of impropriety. It has been stated on numerous occasions that when a judge harbors any doubts concerning whether his disqualification is required he should resolve the doubt in favor of disqualification. See United States v. Alabama, 828 F.2d 1532, 1540 (11th Cir. (1987) (per curiam), cert. denied sub nom., --- U.S. ----, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988); Hall v. Small Business Administration, 695 F.2d 175, 178-79 (5th Cir.1983).
 
 
 79
 We express no opinion on whether any of the above facts standing alone would rise to the level of a Sec. 455(a) violation. We merely conclude that all of these facts taken together raise the appearance of impropriety and may cause one to reasonably question Judge Lynne's impartiality.
 
 
 80
 In Hall the Fifth Circuit found a violation of Sec. 455(a) because a magistrate refused to disqualify himself after it was revealed that his law clerk was a member of the plaintiff class involved in the suit and had accepted employment with class counsel before judgment was rendered. The Fifth Circuit noted that:
 
 
 81
 Law clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decision. Clerks are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be.
 
 
 82
 Id. at 179.
 
 
 83
 This case was later characterized by the Second Circuit as involving actual bias on the part of the law clerk that was imputed to the court. See United States v. Murphy, 768 F.2d at 1539 n. 3. Our decision in the instant case should not be interpreted as imputing to the district judge any appearance of impartiality on the part of the law clerk. See In re Corrugated Container Antitrust Litigation, 614 F.2d 958, 968 (5th Cir.) (for purpose of determining whether a judge should disqualify himself, views of the judge's law clerk cannot be attributed to the judge), cert. denied sub nom., 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980); cf. Hunt v. American Bank & Trust Co., 783 F.2d 1011, 1015-16 (11th Cir.1986) ("A judge is not necessarily forbidden, however, to do all that is prohibited to each of his clerks."). We recognize the importance that some law clerks play in the decisional process and it is for this reason that a " 'clerk is forbidden to do all that is prohibited to the Judge.' " Id. at 1015 (quoting Hall, 695 F.2d at 179). Similarly, when a judge's law clerk has a possible conflict of interest or knows of other disqualifying factors it is the clerk, not the judge, who must be disqualified. Id. at 1016. This problem might have been avoided if Judge Lynne would have taken steps to isolate Somerville from this case.
 
 
 84
 A law clerk, as well as a judge, should stay informed of circumstances that may raise the appearance of impartiality or impropriety. And when such circumstances are present appropriate actions should be taken. In the instant case either Judge Lynne or his law clerk must have known of the grounds for disqualification and either of them should have raised the issue. If the issue had been raised and fully disclosed the employees may have waived the grounds for disqualification.[15]
 
 
 85
 Having determined that a violation of Sec. 455(a) is presented, we now must determine the proper remedy.[16] In Liljeberg the Court noted that:
 
 
 86
 As in other areas of the law, there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance. There need not be a draconian remedy for every violation of Sec. 455(a).
 
 
 87
 -- U.S. at ----, 108 S.Ct. at 2202-03 (footnote omitted).
 
 
 88
 We believe that in this case Judge Lynne's refusal to disqualify himself was indeed harmless error. In determining the proper remedy for a Sec. 455(a) violation the Supreme Court has suggested the following test. Consider: 1) the risk of injustice to the parties in the particular case; 2) the risk that the denial of relief will produce injustice in other cases; and 3) the risk of undermining the public's confidence in the judicial process. Id. --- U.S. at ----, 108 S.Ct. at 2203-05. We believe that these factors weigh heavily in favor of our conclusion that Judge Lynne's decision not to recuse himself was harmless error.
 
 
 89
 First, the risk of injustice to the parties in this case if relief is denied is nonexistent. To the contrary, if we granted the employees relief for the Sec. 455(a) violation and vacated the district court's decision then our action will create an injustice. The district court dismissed the case on summary judgment and therefore this court is in as good a position to determine the merits of the employees' claims as was the district court.[17] See Rollins v. Techsouth, Inc., 833 F.2d at 1527 ("In reviewing a grant of summary judgment, we must give the judgment plenary review, applying the same legal standards that bound the district court."). As discussed previously, we agree with the district court that summary judgment was proper. It would, therefore, be ridiculous to remand this case and reassign it to another judge after we have already exercised plenary review and have concluded that summary judgment was proper. We also note that Judge Lynne announced his tentative decision to grant the Company and the Union summary judgment prior to Somerville joining his staff. Therefore, the risk that Judge Lynne based his decision on Somerville's involvement is remote. But see Hall, 695 F.2d at 180 ("The judge's assertion that he had made up his mind immediately after hearing the case, without the law clerk's assistance, is immaterial. Every judge has suffered a change of heart after reaching a tentative decision. Much might happen during research and opinion writing to affect the decision.").
 
 
 90
 In Liljeberg the Court noted that it is "appropriate to vacate the judgment unless it can be said that respondent did not make a timely request for relief, or that it would otherwise be unfair to deprive the prevailing party of its judgment." --- U.S. at ----, 108 S.Ct. at 2205-07 (emphasis added). As already discussed, it would be unfair to deprive the Company and the Union of their judgment under the circumstances of this case.
 
 
 91
 Next, we do not believe that denying relief in this case will produce injustice in other cases. Provided Judge Lynne refrains in the future from using law clerks to hold hearings with counsel or using law clerks whose impartiality might be questioned, there is no risk of injustice in future cases. Further, since this case was decided on summary judgment our decision will not produce any injustice in future cases.
 
 
 92
 Finally, we do not believe that the public's confidence in the judicial process will be undermined if we conclude that the Sec. 455(a) violation was harmless error. Since we have determined that in fact a violation occurred and strongly urge Judge Lynne to discontinue his practice of crediting the work of his law clerks, we believe that our decision will instill greater confidence in our judiciary. To the extent that public confidence has already been undermined we do not believe that granting relief in this case will change the public's perception in any appreciable way. Such harm cannot be remedied by vacating the district court's decision and reassigning this case to a different judge. In fact, if we reverse and vacate a decision that we have already determined to be proper, the public will lose faith in our system of justice because the case will be overturned without regard to the merits of the employees' claims. Judicial decisions based on such technical arguments not relevant to the merits contribute to the public's distrust in our system of justice.
 
 
 93
 The employees also argue that Judge Lynne was disqualified from presiding over this case under 28 U.S.C. Sec. 455(b)(5)(iii) which would disqualify a judge whose father is a lawyer in the case.[18] See, e.g., Potashnick, 609 F.2d at 1113 ("[W]hen a partner in a law firm is related to a judge within the third degree, that partner will always be 'known by the judge to have an interest that could be substantially affected by the outcome' of a proceeding involving the partner's law firm."). The employees argue that since Somerville acted as the judge's alter ego when he conducted the hearing in the judge's absence, section 455(b)(5)(iii) requires Judge Lynne's disqualification.
 
 
 94
 We do not believe that we have to reach this question in the present case. If we assume that there was a violation of Sec. 455(b) we believe that our discussion of the remedy for the Sec. 455(a) violation would also apply and reversal would not be mandated. In Liljeberg the Supreme Court made it clear that harmless error analysis would be appropriate for a Sec. 455(a) violation. See --- U.S. at ----, 108 S.Ct. at 2202-03. However, it was not made clear whether a violation of Sec. 455(b) could constitute harmless error. Section 455 neither prescribes nor prohibits any particular remedy for a violation of the duties it imposes. Id. ("Congress has wisely delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation.").
 
 
 95
 We begin our analysis by noting some of the differences between Sec. 455(a) and Sec. 455(b). Section 455(a) may be waived by the parties after full disclosure, whereas section 455(b) may not. 28 U.S.C. Sec. 455(e); United States v. Murphy, 768 F.2d at 1540. In addition, section 455(b) is a per se rule that lists particular circumstances requiring recusal. United States v. Alabama, 828 F.2d at 1541 ("The statute also states that the parties cannot waive the per se rules of disqualification set out in Sec. 455(b).") (footnote omitted). Thus, Sec. 455(b) is stricter than Sec. 455(a) and is concerned with situations that may involve actual bias rather than Sec. 455(a)'s concern with the public's perception of the judicial process. Nevertheless, we do not believe that these differences preclude the application of harmless error analysis in the context of a Sec. 455(b) violation.
 
 
 96
 We believe that this conclusion is supported by the Supreme Court's Liljeberg decision. When the Supreme Court outlined the test for determining whether a judgment should be vacated due to a Sec. 455 violation the Court did not draw any distinctions between Sec. 455(a) and Sec. 455(b). Further, in the sentence immediately preceding its test to be used when evaluating the appropriate remedy for a Sec. 455 violation the Court stated: "Rule 60(b)(6) relief is accordingly neither categorically available nor categorically unavailable for all Sec. 455 violations." --- U.S. at ----, 108 S.Ct. at 2203-05 (emphasis added). Therefore, we are confident that the Supreme Court intended its test to be applied to all Sec. 455 violations, whether involving subsection a or subsection b. Accordingly, a determination that Sec. 455(b)(5)(iii) was violated in this case would not change our ruling and we decline to address the merits of the Sec. 455(b) claim.
 
 CONCLUSION
 
 97
 We conclude that the employees' state fraud claims are arguably prohibited by section 8's requirement of good faith bargaining and therefore are preempted under the principles recognized in Garmon. We do not believe that the state fraud claims touch upon local interests that are compelling enough to justify an exception to preemption nor do the claims relate to matters that are of only peripheral concern to the Labor Act. Consequently, the claims are preempted.
 
 
 98
 The employees' claims that the Union breached its duty of fair representation in negotiating the concessions, in processing their grievances, and in seeking ratification of the concessions were also properly disposed of on summary judgment. Mere negligence will not sustain a claim that the duty of fair representation has been breached in any of these contexts. The employees have not shown any genuine dispute over the material facts that would make summary judgment improper. We also hold that the claim for breach of contract against the Company is barred by the award entered in the arbitration proceeding and the finality provision of the CBA.
 
 
 99
 Finally, although we conclude that it was a violation of Sec. 455(a) for Judge Lynne to deny the employees' motion to recuse himself from this case, we believe that it was harmless error.
 
 
 100
 AFFIRMED.
 
 
 
 *
 Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 During the negotiation of the first concession agreement Connors also operated a steel plant in Huntington, West Virginia, but this facility was closed on July 1, 1982
 
 
 [2]
 The Union also urged its members to accept the second concession package
 
 
 [3]
 This type of claim is often referred to as a "hybrid" section 301 suit. See Hester v. Intern. Union of Operating Engineers, 830 F.2d 172, 175 (11th Cir.1987) (per curiam) ("Most duty of fair representation claims arise in the context of what are known as 'hybrid' suits. Hybrid suits involve claims by an employee against both the employer and the union.") (panel opinion on denial of petition for rehearing of 818 F.2d 1537), petition for cert. filed, 56 U.S.L.W. 3627 (March 15, 1988)
 
 
 [4]
 It is clear that to the extent the employees' state law claims require the interpretation of the CBA the claims would be preempted by Sec. 301 of the LMRA. Lingle v. Norge Division of Magic Chef, Inc., --- U.S. ----, 108 S.Ct. 1877, 1885, 100 L.Ed.2d 410 (1988)
 
 
 [5]
 The NLRB dismissed the charges because they were not filed within the applicable statute of limitations
 
 
 [6]
 The CBA in this case expired on September 1, 1983 and the plant ceased operations on the same day
 
 
 [7]
 A company's duty to bargain in good faith with the union does not require it to enter a CBA that it finds unacceptable. See Lumber Production Industrial Workers Local # 1054, 775 F.2d at 1046 ("collective bargaining agreements expire according to their own terms and neither employers nor unions have any implied obligation to enter into a new agreement.")
 
 
 [8]
 We note that this is not an isolated case. The district judge has regularly included such footnotes in published opinions as far back as 1961. See, e.g., Willoughby Roofing & Supply Co., Inc. v. Kajima Intern., Inc., 598 F.Supp. 353, 354 (N.D.Ala.1984), aff'd, 776 F.2d 269 (11th Cir.1985) (per curiam); United States Fidelity & Guaranty Co. v. Slifkin, 200 F.Supp. 563, 582 (N.D.Ala.1961)
 
 
 [9]
 William G. Somerville, Jr., is apparently a former law clerk to Judge Lynne. See id. at 582 ("Credit is due William G. Somerville, Jr., Law Clerk to the Court, for the preparation of this opinion.")
 
 
 [10]
 This argument is weakened somewhat by other language which also appears in the footnote crediting the assistance of Somerville. The district court stated: "More than two years ago the Court announced its tentative opinion that defendants were entitled to summary judgment but deferred to the request of plaintiffs' counsel that action be withheld pending the completion of discovery, which proved to be wide-sweeping." Thus, the district judge had tentatively ruled against the employees prior to Somerville's employment
 
 
 [11]
 Potashnick is binding on this court under the doctrine of Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981)
 
 
 [12]
 Generally, those trained in the law understand that a judge, or even an advocate, is able to maintain social contacts with other members in the profession without allowing these friendships to have any impact whatsoever on his/her professional obligations. See United States v. Murphy, 768 F.2d 1518 (7th Cir.1985), cert. denied, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986)
 The statutory standard puts to the judge a question about the objective state of the legal and lay culture. The court must consider whether an astute observer in either culture would conclude that the relation between judge and lawyer (a) is very much out of the ordinary course, and (b) presents a potential for actual impropriety if the worst implications are realized. The inquiry is entirely objective.
 768 F.2d at 1537 (citation omitted).
 
 
 [13]
 We recognize, however, that ordinarily disqualification of an entire law firm is not required "when the propriety of a former law clerk's participation in a case is drawn in question." Fredonia Broadcasting Corp., Inc. v. RCA Corp., 569 F.2d 251, 255 (5th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). William G. Somerville, Jr., did not actually participate in the instant case, but his relationship with Judge Lynne's law clerk and the fact that he is a former law clerk to Judge Lynne contribute to the appearance of impropriety
 
 
 [14]
 There does not appear to be any dispute over the fact that Somerville held a hearing in order to determine the legal positions of the parties
 
 
 [15]
 28 U.S.C. Sec. 455(e) allows a judge to accept a waiver of any ground for disqualification under Sec. 455(a) after "a full disclosure on the record of the basis for disqualification."
 
 
 [16]
 Most courts hold that section 455(a) embodies a timeliness requirement in order to prevent counsel from withholding facts which support a Sec. 455(a) recusal and then raising the recusal issue only after receiving an adverse ruling on the merits. See, e.g., United States v. Alabama, 828 F.2d at 1544 n. 49; Phillips v. Amoco Oil Co., 799 F.2d 1464, 1472 (11th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987); Hall, 695 F.2d at 179. We need not address this issue in the present case, however, because the employees' attorneys have filed affidavits stating that they did not know of the grounds for recusal until after the district court's opinion was released. Counsel saw Somerville's name in the footnote and it was then that the connection between Somerville and the Company's counsel became known. Section 455 does not require a judge to accept as true all allegations made by a moving party. See United States v. Alabama, 828 F.2d at 1541; Phillips v. Joint Legislative Comm., 637 F.2d 1014, 1019-20 n. 6 (5th Cir.1981), cert. denied, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982). However, in this case the district judge did not hold a hearing or question the accuracy of the affidavits in any way and thus we will accept them as true
 
 
 [17]
 In Phillips v. Amoco Oil Co., this court was faced with a similar Sec. 455(a) question. In that case it was claimed that an appearance of impropriety arose when the law clerk who had drafted Judge Lynne's memorandum opinion accepted employment with one of the law firms involved in the litigation prior to drafting the opinion. This court listed several factors that lessened any appearance of impropriety
 The case had been before the judge for many years and many clerks had worked on it. By the time the law clerk at issue was hired, the judge had formed the conclusion that the employees' claims were without merit. Furthermore, the court granted Norgas' motion for summary judgment at oral argument, before the law clerk began work on the opinion justifying the decision. Additionally, the claims against Norgas were meritless, if not frivolous. Finally, because this case was decided on summary judgment motions, the court was not called upon to resolve conflicts in evidence, weigh the credibility of witnesses or exercise judicial discretion. The district court's decision has been subjected to de novo review by this court.
 799 F.2d at 1472.
 We believe that some of these factors are properly considered in the harmless error analysis rather than in the initial determination of whether there is an appearance of impartiality. Section 455(a) requires consideration of only the objective facts, Hall, 695 F.2d at 179, thus factors that tend to lessen the appearance of impartiality must likewise be objectively ascertainable. Cf. Liljeberg, --- U.S. at ----, 108 S.Ct. at 2202-03. Consequently, considering the merits of the case and its summary judgment disposition is more appropriate when determining whether any error was harmless error rather than when determining whether a violation of Sec. 455(a) has occurred.
 
 
 [18]
 Section 455(b)(5)(iii) provides:
 (b) [A judge] shall also disqualify himself in the following circumstances:
 (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
 (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding.
 28 U.S.C. Sec. 455(b)(5)(iii). Grounds for disqualification under Sec. 455(b) cannot be waived by the parties. See 28 U.S.C. Sec. 455(e).