## In re SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION.

### No. MDL–721.

United States District Court,
D. Puerto Rico.

Aug. 24, 1989.

See also 888 F.2d 940.

---

Ana Luisa Navarro, Liaison, Hato Rey, P.R., for plaintiffs' Steering Committee.

Carlos Padín, Hato Rey, P.R., for defendants' Liaison Counsel.

### ORDER NO. 218

ACOSTA, District Judge.

### IN THE MATTER OF THE MOTION REQUESTING RECUSAL

#### I. MOTIONS FILED

A group of defendants [1] have filed a motion requesting that the undersigned judge recuse himself from this case, that he disqualify two of his three law clerks from further participation in this trial, that he vacate all prior orders issued in this litigation and declare a mistrial of the proceedings held thus far. The motion is based exclusively on the fact that the two law clerks in question have siblings who are members of or are otherwise associated with law firms engaged in this complex case. *See* Defendants' Motion for Disqualification, Recusal and Mistrial (filed under seal), docket No. 12237, filed on August 14, 1989.

The bare factual basis for movants' drastic request is that Mr. Richard Graffam and Mrs. Vilma Vilá, two career law clerks who have worked, as part of a team effort with the undersigned and other members of his staff, on this litigation since its inception two and a half years ago, have brothers [2] who are members of law firms

---

1. The movants comprise approximately half of the defendants in the second phase of trial which began June 27, 1989. This trial phase started with ninety defendants of which twelve have been officially dismissed. *See* Pretrial Order No. 204 (Docket No. 11692, filed June 27, 1989). The forty movants are represented by approximately twenty-seven law firms including local counsel for stateside firms. The names of these moving defendants are included in Appendix A to this Order.

In addition, four other defendants, to wit, La Cor Wicker and the "Erickson Group," represented by three other law firms, have filed a separate motion for mistrial based on the relationship between one law clerk, Richard Graffam, to a partner in a firm representing plaintiffs, William Graffam. Importantly, these four defendants did not join in the motion for recu-

sal yet interestingly they simply request that the Court declare a mistrial and that it vacate only those rulings that have been "adverse to any defendant." For the reasons below, this motion filed under seal on August 14, 1989, docket No. 12234, is hereby DENIED.

Finally, another two defendants, The Trane Company & Trane Export, represented by Amancio Arias Guardiola, filed a motion to join the recusal motion. However, this joinder request was filed beyond the Court's deadline, and it also came completely unsupported by affidavits. Consequently, the request to join, filed under seal on August 14, 1989, docket No. 12233, is hereby DENIED.

2. They are William Graffam of Jiménez, Graffam & Lausell, and Raúl Vilá of Fiddler, González & Rodriguez. Although movants do

that represent plaintiffs and the San Juan Dupont Plaza Hotel. The nub of the controversy here is whether or not the presiding judge must disqualify himself because two of his law clerks are related to lawyers whose law firms have a financial interest in this litigation. Movants contend that this relationship standing alone casts a significant doubt, in the minds of the reasonable Puerto Rican public, about the impartiality of this Court which warrants recusal under 28 U.S.C. § 455(a). They also allege that since there is case law that places judges and their law clerks on equal ethical footing, 28 U.S.C. § 455(b)(5)(ii) and (iii) (1988),[3] must be applied to the law clerks as well.

Plaintiffs have countered these arguments by stating that section 455(b)(5) applies only to the judge and not to his employees. As to section 455(a) they argue that no appearance of impropriety exists when one considers: the tenuous personal connections that have been challenged which do not go directly to the judge; the fact that the family ties, such as they are, exist on both defendants' and plaintiffs' sides; that the size and complexity of this case not only diffuse the normal standards concerning appearances, but also counsel strongly against changing judges and causing an enormously difficult and costly case to begin anew; and, finally, that defendants' motivations are suspect given the untimeliness of their motion and their constructive, if not actual, knowledge of the situation they are now challenging. *See* plaintiffs' opposition to defendants' motion, docket No. 12261, filed August 16, 1989.

## II. THE ISSUES

There are two controlling issues in this case.

1. Does 28 U.S.C. Section 455(b)(5), which requires a *judge* to automatically recuse himself, based on particular family relationships, apply to the judge's law clerks?

2. Does the fact that law clerks who are part of the Court's "Dupont Team" and who have siblings that work for law firms representing both the defense and prosecution sides of this case make a reasonable man who is fully informed of all the facts entertain a significant doubt about the presiding judge's impartiality given the complex nature of the case and the timeliness of the recusal motion?

## III. DISCUSSION

### A. APPLICABILITY OF 28 U.S.C. § 455(b)(5) TO LAW CLERKS

Starting with the premise that "[t]he law subjects a judge's law clerks to the same ethical constraints that govern the judge," Defendants' Memorandum at 17–18, (citing *Parker v. Connors Steel Co.,* 855 F.2d 1510, 1525 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989); *Hall v. Small Business Administration,* 695 F.2d 175, 179 (5th Cir.1983), and *Miller Industries, Inc. v. Caterpillar Tractor Co.,* 516 F.Supp. 84, 89 (S.D.Ala.1980)), movants leap to the erroneous conclusion that section 455(b) applies to law clerks. However, that provision, by its own terms, applies exclusively to judges.[4]

not mention it in their motion, Mr. Richard Graffam in fact has another brother, Keith Graffam, who has actively participated in this litigation in representation of two insurers for certain defendants. In addition, Mrs. Vilá's husband, Doel Quiñones, was an associate of the law firm of O'Neill & Borges which represents Insurance Services Offices, Inc.; ISO Commercial Risk Services, Inc.; and ISO Telecommunications, Inc., defendants in this second phase of trial. Mr. Quiñones worked in O'Neill & Borges from 1981 to April of 1988.

3. This section mandates the recusal of a judge when a family member within the third degree of relationship to either him or his spouse appears as an attorney before him or has a financial interest in the outcome of the proceeding.

4. Section 455(b) reads in relevant part:

(b) He [any justice, judge, or magistrate of the United States] shall also disqualify himself in the following circumstances:

(5) He or his spouse or a person within the third degree of relationship to either of them, or the spouse of such person:

(ii) Is acting as a lawyer in the proceeding;

With a blind eye, movants read as the "clear requirements of Section 455(b)" that it is "indisputable" that Richard Graffam and Vilma Vilá must be disqualified. This Court sees nothing clear or indisputable about movants' argument. Quite the opposite; if anything is pellucidly clear it is the fact that neither the straightforward language of Section 455(b) nor any case law regarding it support their slim contentions. Movants have cited no case where a court has disqualified a law clerk pursuant to Section 455(b) and we can find none. It is not surprising then that in their twenty page brief, a scant two pages address this issue.

We begin where we must—with the unambiguous language of Section 455(b)(5)(ii) and (iii). The pointed text of the statute addresses only a *judge's* blood ties to litigants appearing before him or having a substantial interest in the outcome of the case. Unlike Section 455(a) with its more amorphous language of reasonable questions of impartiality (read: appearance); Section 455(b) leaves nothing to question. It is meant to automatically exclude judges from situations that fall under the specific provisions of the statute. In that sense, Section 455(b) is meant to supplement Section 455(a) by detailing situations that Congress considers to be tantamount to actual bias.[5] If a *judge* has a relative working or benefitting in some way from the case, he must recuse himself. Because of the specific and forceful nature of this section, it must be construed narrowly. Thus, when Congress says judges, it means judges; not their law clerks, secretaries or courtroom staff. The various staff members of a

judge may have something to do with the public's perception of that court—but Congress wisely left that matter to an *ad hoc* interpretation by the courts when it fashioned Section 455(a). With similar judiciousness, Congress decided that there were simply some circumstances—some relationships or financial connections, if you will—that had to *a priori* control a judge's hand. Given the drastic measure employed, the limitations had to be explicit.[6] These situations, and these alone, were considered *per se* violations of proper judiciary procedure under section 455(b). Bedrock rules of statutory interpretation can lead to no other conclusion: "Inclusio unius est exclusio alterius," the inclusion of one is the exclusion of another. In the case at bar, Congress' certain designation of one person, a judge, in the limiting language of Section 455(b), is an absolute exclusion of all others, including law clerks.

The cases cited by the defendants in support of their section 455(b) arguments are inapposite to their prayer for relief.

In *Parker v. Connors Steel Co.*, 855 F.2d 1510 (11th Cir.1988) where the Court of Appeals held it was harmless error for a district court not to have recused itself when the judge's law clerk was the son of a partner (who in turn had been a former law clerk to the judge) in the firm representing the prevailing party, the court's holding was based entirely on Section 455(a). *Id.* at 1528. The Court mentioned section 455(b) in dictum only for the purpose of extending the harmless error standard of review to *all* of Section 455. The Eleventh Circuit never applied Section

---

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding.

**5.** The fact that Section 455(b) does not apply to law clerks, does not mean that they can act with impunity. But the pall that the conduct of a law clerk may cast over the integrity of his judge, is covered by the appearance of impropriety notion inherent in section 455(a). Nonetheless, whatever appropriate ethical foothold law clerks must obtain in the employ of the judiciary; the judge cannot be made an easy victim of the clerk's follies or perceived faults. "If a clerk has a possible conflict of interest, it is

the clerk, not the judge, who must be disqualified." *Hunt v. American Bank & Trust Co. of Baton Rouge*, 783 F.2d 1011, 1016 (11th Cir. 1986). "For purpose of determining whether a judge should disqualify himself, views of the judge's law clerk cannot be attributed to the judge." *In re Corrugated Container Antitrust Litigation*, 614 F.2d 958, 968 (5th Cir.1980).

**6.** *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194 at 2202, 100 L.Ed.2d 855 (1988), n. 8 ("section 455(b) is . . . a somewhat stricter provision, and thus is not simply redundant with the broader coverage of § 455(a) . . . .").

455(b) to disqualify law clerks as defendants pretend this Court should do in the instant case.

In another case, *Hall v. Small Business Admin.*, 695 F.2d 175 (5th Cir.1983), wherein a magistrate's law clerk had been a plaintiff in a class action suit before the magistrate, the Fifth Circuit specifically found that there was a sufficient appearance of impropriety to mandate recusal. Again, the *Hall* court relied exclusively on Section 455(a).

Movants' misleading presentation of the case law in this area is at best a tautological exercise in the use of principles applicable to Section 455(a) to subvert the clear import of Section 455(b) and its attendant jurisprudence. *See, e.g., Barksdale v. Emerick*, 853 F.2d 1359, 1362 (6th Cir.1988) (fact that one of the litigants had a son working for the presiding judge was not a *per se* basis for a section 455(b) disqualification, albeit it was cause for concern under Section 455(a)).

In short, movants twist the clear text of Section 455(b), while ignoring long established notions of statutory interpretation, to serve their own purposes. Since Section 455(b) cannot be triggered because there are no direct ties between the litigants and the judge, movants cannot and do not seek the recusal of the judge through this provision. Rather, they attempt to use this explicit law as a trap door to rid the judge of two of his clerks. This is a maneuver that has no legal support.

### B. SECTION 455(a): APPEARANCE OF IMPROPRIETY

█ Section 455(a) reads as follows: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This language was codified in 1974 by a Congress concerned with promoting and ensuring public confidence in the integrity of the federal judiciary. As part of that goal, Congress changed the test for a Section 455(a) recusal from a subjective one, which contained a presumption against disqualification otherwise known as a "duty to sit," to an objective one, where it was no longer the judge's personal opinion that controlled, but rather his application of a "reasonable man" standard.[7] The tenet of Section 455 has remained the same throughout its various amendments; that being that the confidence of the lay public in the judiciary depends on judges avoiding even the appearance of impropriety whenever possible. *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 2205, 100 L.Ed.2d 855 (1988) (Citing S.Rep. No. 93–419, at 5; H.R.Rep. No. 93–1453 at 5, 1974 U.S.Code Cong. & Admin. News, 6351). Thus, Section 455(a) has become broadly known as the "appearance of impropriety" provision of the recusal statute.

The First Circuit Court of Appeals has amply recognized the "competing twin policies" of Section 455(a): the "obvious one" being to help appearances of fairness cement the public confidence, and the "less obvious policy" being that "... a judge once having drawn a case should not recuse himself on an unsupported, irrational, or highly tenuous speculation ..." *In re United States of America* 666 F.2d 690, 694 (1st Cir.1981). Should the importance of this "less obvious" policy escape anyone, the First Circuit pointedly concluded that maintaining the purity of appearance is not worth the cost of giving litigants a negative veto power over the assignment of judges.

It is precisely to avoid this danger that Section 455 must be narrowly construed, *See, e.g., State of Idaho v. Freeman*, 507 F.Supp. 706, 733 (D.Idaho 1981), and the allegations of counsel must pass the litmus test of good faith. Thus, it was Congress' clear intention—as the federal courts have consistently held—that a Section 455 dis-

---

7. The original Section 455 read in its entirety: Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein.
June 25, 1948, C. 646, 62 Stat. 908.

qualification should not be allowed on the bases of rumors, innuendos, unsupported allegations, or claims that like blind moths, flutter aimlessly to oblivion when placed under the harsh light of the full facts. In short, the strategic maneuverings of counsel cannot divert the true course of the judicial process already navigated by an impartial judge. *Blizard v. Frechette* 601 F.2d 1217 (1st Cir.1979).

To summarize: while a judge is charged with the duty of maintaining the appearance of impartiality whenever he can he must also be wary of the possible improper motivations behind an application for disqualification. In this vein, a challenge to a judge's appearance of impartiality must be convincing in light of (1) the nature of the case, (2) the facts and (3) the timeliness of the motion.

With these policies and guidelines in mind we need to examine the legal standard applicable to this case and whether or not movants have met their burden.

## 1. NATURE OF THE CASE

### A. MANAGEMENT

*In re San Juan Dupont Plaza Hotel Fire Litigation,* No. MDL–721, is the multi-district case that arose out of the catastrophic fire that engulfed the San Juan Dupont Plaza Hotel on New Year's Eve 1986, killing 97 people and injuring scores of others. The first fire-related lawsuit was filed barely five days after the blaze and assigned to this judge. Several months later the Multi–District Litigation Panel transferred a case filed in California to Puerto Rico for pretrial proceedings with the cases already pending in this district, thus making the undersigned the transferee judge for this litigation.[8]

The litigation grew quickly in heroic proportions. More than 250 individual complaints were filed by 2,300 plaintiffs suing in excess of 200 defendants for damages totalling approximately two billion dollars. This immediately spurred the undersigned

into an active managerial role to organize and control the litigation in an innovative way in order to ensure the fulfillment of the Court's paramount duty: "to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1.

Based on the foregoing, two basic types of organization were immediately required: (1) organizing the parties and (2) organizing the courthouse. The first required the formation of several committees of lead attorneys to streamline the huge task of gathering and presenting evidence for all concerned. In the main, the most important committees have been the Plaintiffs' Steering Committee ("PSC") comprised of eleven lawyers and their respective law firms and charged with representing all the plaintiffs' interests in this case and the Discovery Committee composed of ten defense attorneys representing ten distinct categories of defendants and three members of the PSC for a total of thirteen members. The Discovery Committee's task, as the title implies, was to coordinate and handle most discovery matters. Importantly for the issues before us, the members of these committees underwent an application and selection process established by the Court in which *all* the parties participated. *See* Pretrial Order No. 127 ("Case Management Order", docket No. 7100, filed December 2, 1988), Section IV(D) and IV(E) at pp. 24–60.

The management of this case from the point of view of the courthouse was approached from the beginning as a team effort. Initially, the "Dupont Team" consisted of the law clerks already working in chambers, Vilma Vilá and Richard Graffam, as well as the secretary, docket clerk and courtroom deputy clerk. Soon after, Magistrate Justo Arenas and his law clerk joined the team. Since the existing staff could not handle the entire litigation and the Court's regular workload of over 300 cases—which the Court to this day is still handling simultaneously [9]—an additional

---

**8.** In due time, the cases were all consolidated for trial purposes as well. *See* Pretrial Order No. 130 (Docket No. 7400, filed December 21, 1988).

**9.** Currently, the Court has a caseload of 450 civil cases, including the Dupont, and 20 criminal cases. In addition, an average of 30 new cases are assigned to this judge every month. The Dupont trial normally proceeds daily from 9:30

law clerk, Pedro Malavet, secretary and docket clerk were hired in September of 1987. In July of 1989, Mr. Malavet entered private practice and was replaced by Ms. Edilia Vázquez.

The dynamics within the "Dupont Team" have remained the same throughout. All law clerks and the magistrate have been active in "brainstorming" sessions, and at times, even role playing situations are used to explore all possible strategies and their ramifications. Suggestions are made by all equally, but the ultimate decision has always been made by the undersigned. The goal is simple: to anticipate problems and to make sure the discovery machine, and later the trial proceedings, are working as smoothly as possible. The team approach ensures that there is always someone available at any given time to continue with the orderly non-substantive operation of the case despite absences due to vacations, illnesses or resignations. There is also an added benefit in the wide range of input received with respect to methodology, systems, innovative ideas, and research.

To engage in an understatement concerning this litigation: the managerial role of the Court in this case has had to transcend the administration of an ordinary civil proceeding. The Dupont Team approach has been critical in this administration.

### B. TWO AND A HALF YEARS OF LITIGATION

The pretrial discovery, in the words of the First Circuit, was a "gargantuan undertaking." *In re San Juan Dupont Plaza Hotel Fire Litigation.* 859 F.2d 1007 (1st Cir.1988). More than 3,000,000 documents were produced, countless interrogatories were served, and depositions, up to 25 in a single day across various states and foreign countries, totalled 2,200 over a nine-month period. A special "Joint Document Depository" ("JDD") had to be established to handle the depositions and facilitate the millions of documents and hundreds of pieces of evidence to all parties.

This "litigatory monster," another variegated and poignant metaphor used by the First Circuit, *see In re Recticel,* 859 F.2d 1000 (1st Cir.1988), has been far from inexpensive compared to other cases. Yet, in spite of its size and complexity, substantial savings and speediness have been achieved. Nonetheless, current estimates place the costs in terms of attorneys fees and expenses in the tens of millions of dollars. Considering the legion of attorneys involved in this case, this exorbitant expense is not difficult to conceive. There are more than 230 attorneys in the service list and this does not include the hundreds of associates and paralegals that work with them.

The case file consists of over 200 volumes, which includes more than 12,000 docket entries (the docket sheet alone is in excess of 500 pages). The Court has issued more than 200 pretrial and trial orders, including a 220–page "Case Management Order," and over 500 "margin orders."

The trial of the case was scheduled in phases. The first phase involved the "Dupont Family" and was resolved after two months of trial. The current trial phase dealing with the "products and services" defendants began in June of 1989. The pretrial memorandum for the current phase alone comprises 40 volumes containing 17,000 pages.[10] A substantial amount of testimony and documentary evidence has already been presented.

### C. SUMMARY

The engulfing nature of this case, and the manner in which it has been handled, plays an important role in determining what "appearances" can reasonably be garnered from it (we are convinced that only a

---

a.m. to 2:30 p.m.; trials of "regular" cases and other matter are handled in the late afternoons at times in a distant courtroom. (The courtroom constructed specially for the Dupont trial is in Hato Rey while the U.S. District Courthouse where criminal proceedings are held is located in Old San Juan.)

10. Members of the Joint Document Depository weighed the Pretrial memorandum in at 149 pounds.

perception of propriety and fairness will prevail). In raising the spectre of partiality movants claim that they have discovered an "appearance of impropriety" sufficient to compel the Court to dismantle the entire process it has so carefully and laboriously established over a period of two and a half years. As plaintiffs have correctly stated: "The ripple effect of granting defendants' motion would be a tidal wave of delay, costs, and loss of confidence in the system. Recusal of the judge would flood this Court with motions to set aside all prior orders and settlements in this proceeding and place countless other procedural machinations at defendants' disposal. These factors weigh heavily against mistrial and recusal." Plaintiffs' memorandum in opposition ..., docket No. 12261, at page 9.

## 2. GROUNDED ON FACTS

■ The relevant test for a Section 455(a) recusal is whether the charge of impartiality is sufficiently grounded on facts to create in the mind of the fully informed objective disinterested observer of our community a reasonable or significant doubt concerning the judge's impartiality. *U.S. v. Cowden*, 545 F.2d 257, 265 (1st Cir.1976); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989); *Smith v. Pepsico, Inc.*, 434 F.Supp. 524 (S.D.Fla.1977) (community standard); *Hall*, 695 F.2d at 176.

The key to the test is whether there is a *reasonable factual basis* for disqualification in this case. *Cowden*, 545 F.2d at 265.

Moving defendants argue that "[t]o any reasonable lay observer, the continuous, active participation of law clerks who are related to persons having an interest in the litigation has created the appearance of impropriety ... [a]ccordingly, the law requires the immediate disqualification of the

Court and the declaration of a mistrial." Defendants' Memorandum at 14. Their simple *basis* for this draconian remedy is that the law clerks,[11] Richard Graffam and Vilma Vilá, have brothers who work at law firms that represent parties in this case.

Although there is not a single case directly on point, movants have canvassed an entire line of cases dealing with conflicts of interest of law clerks due mostly to employment offers by litigants to vainly support their allegations that "the clerks' intimate involvement in this litigation has forever tainted the proceedings." Defendants' Memorandum at 14. Clearly this case does not involve a situation were a law clerk accepts a promise of employment from a party or otherwise has a pecuniary interest in the case. Therefore, we find the great majority, if not all, of the cases cited by defendants inapposite to the facts before us.

*Parker v. Connors*, 855 F.2d 1510 (11th Cir.1988), a case relied upon by defendants, involved a law clerk whose father was a partner in the firm representing defendants in a case before the law clerk's judge. Readily distinguishable from our situation, however, were the facts that the law clerk's father had also been a law clerk to the district judge; the judge had a habit of giving credit to his clerks in his opinions and treating them as quasi-judges, and the law clerk had presided over a hearing with counsel in the absence of the judge. In addition, the case involved only one defendant. The Court of Appeals in *Parker* refused to express an opinion as to "whether any of the above facts *standing alone* would rise to a level of a section 455(a) violation." *Id.* at 1524–25 (emphasis added). Rather, it was the aggregate of these circumstances that led to a reversal.[12] The *Parker* Court went on to caution that its decision in that case was not to be inter-

**11.** From our discussion in the previous section of this order it is not disputed that Section 455(a) as opposed to Section 455(b), *does* apply to law clerks but the caselaw, as will be explained below, has generally drawn a limit to pecuniary interests, particularly future employment.

**12.** *Cf. w/Parrish v. Board of Com'rs. of Alabama State Bar*, 524 F.2d 98 (5th Cir.1975) wherein the Circuit Court conceded that in determining the need for disqualification, all circumstances bearing upon it should be considered, yet refused to accept the contention that a variety of circumstances, each insufficient if standing alone, would mandate sufficiency in the aggregate.

preted as "imputing to the district judge any appearance of impartiality on the part of the law clerk." *Id.* at 1525 (citations omitted).

■ The main question here remains whether a reasonable Puerto Rican, given our small legal community and the gargantuan size of this case, would reasonably believe that because 2 out of the 3 law clerks to the undersigned have relatives in law firms representing both sides of the litigatory fence that this judge might, by his legal decisions,[13] confer a favor on either defendants or plaintiffs in order to please one of his clerks over the other. *Ricci v. Key Bancshares of Maine,* 111 F.R.D. 369 (D.Me.1986). We think not. To recapitulate: two of the law clerks of the undersigned judge have brothers who work in law firms representing parties in this case. Richard Graffam has a brother, William, who is a named partner in one of the eleven law firms that compose the Plaintiffs' Steering Committee which in turn represents over 2,300 plaintiffs (themselves individually represented by countless attorneys) in this litigation. Another brother, Keith, is an associate in a law firm representing the insurers of the Dupont Hotel. Vilma Vilá has a brother, Raúl, who is a partner in the firm representing the Hotel itself and her husband, Doel Quiñones, worked until last year for a law firm that represents three defendants in the current trial phase. Given that these relationships, not in themselves significant, are nonetheless representative of both the prosecution and defense interests in this case, it is hard to imagine how this Court could, in the public's eye, fall from the high wire of propriety when the balancing pole is so evenly weighted—particularly in a case of this magnitude.

Movants make (too) much of the fact that the Court never officially disclosed these relationships of his clerks to the attorneys-even though the Court knew about it all along. This is putting the cart before the horse. A judge's duty to disclose and thereby disqualify himself is automatically triggered by any relationship he may have to the parties or their attorneys. Here there is none. A judge, however, must also be careful to avoid appearances of impropriety. Should he happen upon one, he should disclose it immediately and recuse himself *unless* the parties waive their rights under Section 455(e). It is important to remember that Section 455(a) does not provide the *judge* with an option: He *must* recuse himself if there is an appearance of impropriety. The parties do have an option; however, it is premised first and foremost in the existence of a need to recuse by the judge. This judge did not ever and still does not feel that the tenuous connections drawn by defendants, given all the circumstances, create a true appearance of partiality. Nor is there any case or statutory law that would, or can, inform this judge that the situation is otherwise. Section 455(a) cannot be drawn so broadly as to make any possible family line between a mammoth case such as this and the judge's chambers, as opposed to the judge himself, automatically fall under the shadow of dubious appearances. Thus no recusal (or mistrial) is appropriate in this case. Disclosure, on the other hand, is relevant only to the waiver provisions of Section 455(e) and that is not in issue here.

Finally, the Court is truly at a loss to understand why movants insist on portraying this issue as one that is indisputable and clearly established. Defendants have approached this matter as if they had suddenly found a hidden passageway and uncovered some dark musty tomb full of evil secrets and Court family skeletons when the only mystery before us is why these competent attorneys, veterans of years in this litigation, would engage in this charade of being somehow blinded by the Court when the road to their tentative and belated findings was full of arrows pointing in the right direction.

---

**13.** It is also worthwhile to note that it is the jury in this case, and not the judge, who will ultimately determine the fate of both plaintiffs and defendants. *See, e.g., Simonson v. General Mo-* *tors Corp.,* 425 F.Supp. 574 (E.D.Pa.1976) ("It is also noteworthy that this case will be tried to a jury; hence that body will determine all factual matters.").

### 3. TIMELINESS

■ Even though Sec. 455 does not specifically mention a timeliness requirement, we find that it is a requisite to petitions based on this statute, *see Apple v. Jewish Hospital and Medical Center*, 829 F.2d 326, 333 (2nd Cir.1987); *In re City of Detroit*, 828 F.2d 1160, 1167 (6th Cir.1987); *In re International Business Machines Corp.*, 618 F.2d 923, 932 (2nd Cir.1980), and that it will be considered as one of the factors in ruling on petitions filed under this provision. *Apple*, 829 F.2d at 334; *In re City of Detroit*, 828 F.2d at 1167.

In this sense, there is an important threshold requirement to all petitions for recusal and that is good faith on the part of the petitioner. Implicit in this good faith showing is the timeliness of the motion. *See In re United States of America*, 666 F.2d at 695 ("the potential waste of judicial resources alone requires that a motion for disqualification be timely filed.") *See also Hall v. Small Business Admin.*, 695 F.2d at 179. Timeliness also comes into sharp focus when considering the amount of time, work and money that has been expended on the case when the motion for recusal is filed. *In re International Business Machines Corp.*, 618 F.2d at 933; *City of Cleveland v. Cleveland Elect. Illuminating Co.*, 503 F.Supp. 368, 370 (N.D. Ohio 1980).

One of the purposes behind the timeliness requirement is to protect the Court and the judicial system from petitions motivated by a desire to protract the litigation, *U.S. v. Durrani*, 835 F.2d 410, 427 (2nd Cir.1987) ("safeguard ... from last-minute dilatory tactics") or save it as a tool to use conveniently depending on how the proceedings develop. "[A] movant may not hold back and wait, hedging its bets against the eventual outcome." *Apple*, 829 F.2d at 334. *See also Phillips v. Amoco Oil*, 799 F.2d 1464, 1472 (11th Cir.1986) ("counsel ... may not lie in wait, raising the issue only after learning of the court's ruling ...")

In its eagerness to safeguard the appearance of impartiality of judges when it fashioned section 455(a), Congress did not overlook the opportunities for abuse inherent in the new reasonableness standard. The House Report contains a message constantly echoed by the Courts. Addressing the possibility that counsel might seek an unfair litigation advantage, Representative Cowden stated that "Litigants ... are not entitled to judges of their own choice." The Report continues: "... in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in reality seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a reasonable basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial." (H.Rep. No. 93–1453, 93 Cong., 2d Sess. reprinted in 1974 *U.S.Code Cong. & Admin.News*, 6351, 6355).

■ Even if we were to take defendants' arguments at face value, we find that they failed to diligently bring this matter to the attention of the Court. This issue was first presented to the Court at the *in chambers* meeting by the members of defendants' trial liaison counsel on August 7, 1989 yet defendants knew of the facts supporting their request at least by July 14, 1989,[14] when opening arguments in the second phase concluded. Arturo Diaz in his affidavit states that he first realized that the firm of Jimenez, Graffam & Lausell had an economic interest in these proceedings when he spoke with William Graffam during opening arguments.[15] The presence of William Graffam in the courtroom during opening argument seems to have triggered, according to defendants, their knowledge as to the relationship.[16]

---

**14.** Opening arguments lasted from July 10 to July 14, 1989.

**15.** Paragraph 5.

**16.** See statement of Mr. Massery at Tr. 17.

At the latest, according to the affidavit of Victor Maddox, he became aware of this relationship on or about July 20–21 [17] and yet the matter was brought to the attention of the Court on August 7, 1989 after a substantial amount of evidence had been presented and after certain unpopular rulings concerning these defendants were issued.

In addition, the Court is not convinced by defendants' arguments that it was not until recently that they were able to ascertain the facts supporting their allegations of appearance of impropriety.

In their affidavits and statements [18] counsel generally state that it was only after the second trial phase began that they learned about: (1) Richard Graffam's role in the MDL–721 litigation and/or (2) his family ties with William Graffam and/or (3) the economic relationship between David Indiano and William Graffam, through the firm of Jimenez, Graffam & Lausell.

Most moving defendants contend that even though they knew of the aforementioned relationships, it was not until recently that they were able to make the connection between these three (3) persons and the case. That is, they knew about David Indiano and William Graffam being members of the same firm but not that William Graffam and Richard Graffam were brothers; or that they did not know David Indiano worked with William Graffam; or that they knew that Richard Graffam was a law clerk with the undersigned but were unaware that he was working with the undersigned in the handling of this case.

Contrary to movants' position, we find that the overwhelming evidence leads to the inescapable conclusion that there has been a wealth of information available to these defendants since the very beginning of this litigation which should have alerted each and every party and its respective counsel as to *all* aspects of these relationships.

Defendants nonetheless claim that their motion is made in good faith and that the delay in filing their motion, if any, is due to the fact that David Indiano was prosecuting cases on his own behalf and not that of the law firm. They further argue that they were never served with the individual complaints but merely with the master complaint and thus they could not have noticed that the *"Jiménez, Graffam & Lausell"* law firm was involved.[19] Defendants' implication that they lacked knowledge of the contents of the individual complaints because they may not have been served with them simply shows how far these attorneys will go to deny the obvious. The master complaint contains only allegations as to liability against all defendants in the litigation. It does not mention damages nor does it pray for any particular sum certain for damages. These can be found only in the individual complaints. Certainly, defendants had a duty to review these complaints to answer them, and prepare for discovery and trial.

Neither can defendants seriously argue that they were not aware that David Indiano was employed by Jimenez, Graffam & Lausell. The application for appointment to the PSC filed on February 20, 1987 (docket No. 32) was submitted precisely by the firm with the names of 3 proposed candidates which included Mr. Indiano, William Graffam, and Steve Lausell. Later on, his appointment to the PSC in Pretrial Order No. 2 issued on March 18, 1987 (docket No. 95) specifically listed him with the name of the firm. In the April 27, 1987 issue of the National Law Journal he appears as one of the PSC members followed by the name of the firm. The notice publishing Mr. Indiano becoming a member of

---

**17.** Paragraph 6.

**18.** It is important to note that only 13 affidavits were submitted and therefore some moving defendants' counsel did not support the general petition for recusal.

**19.** All complaints have the firm's name. At least two were signed by William Graffam (87–272 and 87–273); others, which were signed by David Indiano, have the firm's name in the cover page (87–1676, 87–1677 and 87–1678); and there are others in which Jimenez, Graffam & Lausell *by* David Indiano appear as counsel of record (87–1733, 87–1734 and 87–1735).

the firm effective May 1, 1988 was published in English in 2 newspapers of general circulation in Puerto Rico.[20] His name on the service list of attorneys clearly designates the law firm.

There are countless deposition transcripts where the appearance of "Jimenez, Graffam & Lausell by David Indiano" is noted in the front page [21] some of which date back to the fall of 1987 and many of which were precisely at the very offices of the firm.[22] Among those present during the taking of some of these depositions were counsel, and or members of their firms, who are now requesting recusal [23] including some who submitted supporting affidavits.[24]

Apart from the fact that certain affiants themselves or members of their firms were present during the taking of these depositions, these transcripts were filed with the Joint Document Depository where copies were available to all parties to this action.

In addition, contrary to certain defendants' position,[25] David Indiano issued correspondence on the Jimenez, Graffam & Lausell letterhead including matters exchanged between him and precisely some of the moving defendants, which were members of the Discovery Committee along with Mr. Indiano such as Michael Black, Carl Henlein and Edward Moss, who in turn, addressed matters to him in care of Jimenez, Graffam & Lausell.[26]

The name William Graffam is by no means obscure in this jurisdiction. As already mentioned, two of the individual complaints filed on behalf of the firm were signed by William Graffam. Furthermore, in the application process for PSC membership, William Graffam submitted his name as one of the proposed candidates representing the firm and he also signed the pertinent motion.

He is a name-partner in a firm in this small jurisdiction where, mainly because of the language barrier, the attorneys that try cases in federal court are proportionately few. In addition, William Graffam has certainly become a well-known attorney because of his active participation as counsel in numerous cases in the U.S. District Court for Puerto Rico. He has also been court-appointed to several committees such as the First Circuit Judicial Conference of 1986 Planification Committee; in 1988, he was appointed by Hon. Gilberto Gierbolini to serve as part of a 4–member committee to review alleged unethical conduct by another attorney *In the matter of Jesus Hernandez Sanchez* Misc. 88–133 [27]; he was nominated by Hon. J. Torruella and appointed by Chief Judge Levin Campbell on November 18, 1988 to serve on the First Circuit Advisory Committee on Rules for a period of 2 years, and is also a law professor at the University of Puerto Rico School of Law. Furthermore, Hon. J.A. Fuste, a former member of the firm was appointed district court judge 5 years ago.

Richard Graffam, a law clerk to the undersigned since August 1986, has been part of the "Dupont Team", together with the rest of the Court's staff since this litigation

**20.** San Juan Star August 17, 1988 (Exh. J) and El Nuevo Dia August 18, 1988 (Exh. K).

**21.** Exh. L to PSC's opposition.

**22.** Exhibits L and S to PSC's opposition.

**23.** C.A. Chavier Stevenson; Garcia & Gonzalez; Paxton & Seasongood; Denenber, Tuffley, Bocan, etc. and W. Douglas Smith for Honeywell.

**24.** Rúa & Mercado; Anderson, Moss, Russo & Cohen; Brown, Todd & Heyburn; Wicker, Smith, Blomqvist, et al.; Cancio, Nadal & Rivera; Trias, Doval, Muñoz, et al. and Rivera, Tulla & Ferrer.

**25.** At the *in chambers* conference Mr. Moss, in denying any prior knowledge of William Graffam or his law firm, went as far as saying "the only letterhead I have ever really received ... has been from the PSC, ... and I don't know David Indiano's firm." [Tr. 5] Yet, as pointed out in note 26 below, not only did he receive correspondence from Mr. Indiano with the firm's letterhead but Mr. Moss also addressed correspondence to him at the firm.

**26.** See Exhs. M, N, O, Q, R and U to PSC's opposition.

**27.** Two of the other four persons in the committee are members of firms participating in this trial Pedro Santa of O'Neill & Borges, and Marta Quiñones of Cancio, Nadal & Rivera, where Arturo Diaz is also employed.

first started. This particular fact has been the subject of at least one article in a national legal publication,[28] Two articles in the Caribbean Business publication mention him by name. In the January 12, 1989 issue the article reads "Acosta gives much credit to his three clerks, Graffam Rodriguez, Vilma Vila and Pedro Malavet ... Together, the group refines arguments before an order is issued. Sometimes they spend hours arguing a question, with each person acting as devil's advocate on a specific side. During an interview in which Graffam Rodriguez and Malavet were present, the judge deferred easily to them in conversation." (p. 17) The following week, on January 19, 1989, a picture of the undersigned with two the law clerks bore the following caption: "Judge Raymond Acosta ... discusses the impending workload with his law clerks, Richard Graffam Rodriguez ... and Pedro Malavet." (p. 27) In the January 8, 1989 Sunday edition of the San Juan Star at least three pictures of Richard Graffam, one in the front page, were published in a lengthy article reporting on the management of the *Dupont* litigation (his name was also mentioned several times).

The name Richard Graffam was specifically mentioned in the voir dire for both the first and second trial phases.[29]

Additionally, along with the other 2 law clerks at that time [30] and the U.S. Magistrate's law clerk, Richard Graffam regularly attended the monthly/periodic status conferences during approximately two years dealing with discovery and trial. During each of these conferences, Mr. Graffam and the other law clerks sat by the bench at the witness box facing the public area which was occupied by an average of 80 attorneys per conference. Throughout the first trial phase these 3 law clerks made regular appearances in Court and sat at a specially designated table in the well of the courtroom facing the attorneys with a sign which read "law

clerks." During the second phase they were frequently present during voir dire and at the trial, always sitting in a specially designated areas in the well of the courtroom facing counsel.

All of these facts, taken together, lead us to the obvious conclusion that the 3 law clerks who participated in this litigation through at least last July were familiar faces to counsel and since they were only 3 throughout all this time their names could not have been so difficult to remember.

In the motion, the defendants briefly address the alleged conflict of Vilma Vila. It states that "[s]hortly after the conference on August 7, moving defendants further confirmed that the brother of Vilma Vila ... has been a partner in the firm ..." representing the San Juan Dupont Plaza Corporation. Yet, out of the 13 affidavits filed with the motion, only Eric Tulla and Adrian Mercado mention her name and then only to state that they recently learned of the relationship.

Given these facts, there is a distinct possibility that the defendants might have decided to conveniently ignore all these facts until, in their view, it best served their interests. Our position that the relationship between William and Richard Graffam and the MDL-721 litigation was commonly known to all counsel in these proceedings is further supported by the statements of Gary Bostwick, Esq. who represented defendants in the first trial phase and is further corroborated by Charles Cordero, Esq. also representing defendants in this litigation.

Given the particular system that most, if not all, of the defendants to this second phase trial have utilized to coordinate their defense to this litigation, it would appear naive to believe that this information, which we find to be of common knowledge at least to local counsel, was not shared among all defense counsel. As a matter of

---

**28.** *See* The National Law Journal of January 11, 1988.

**29.** The voir dire for the first phase lasted a total of 5 days and 7 days for the second phase. During both phases the names of all 3 law clerks were mentioned to each panel of venire persons an average of 3 to 5 times each day.

**30.** Pedro Malavet and Vilma Vila.

fact, the issue was first presented jointly in chambers by defendants' liaison counsel and most defendants joined in a single petition.

Another factor which raises a doubt as to the good faith on defendants' part is their complete failure to mention Keith Graffam in their motion and in all but 1 affidavit [31] and even then, by passing. At the August 7, 1989 meeting, it was specifically mentioned that Keith Graffam was also a brother to William and Richard and also that he was employed with the firm of Charles Cordero who represents 2 defendants to these proceedings.[32] Defendants have tailored their arguments only to those facts which support their allegations of an appearance of impropriety that may give the impression that the Court might favor plaintiffs in this case.

Any possible argument that they were not aware of Keith Graffam are clearly unfounded. He attended numerous depositions taken in the discovery process of these proceedings and his appearance is noted on the front page of the deposition transcript.[33] Furthermore, he worked as a law clerk to Magistrate Arenas from 1985–86 at which time many of the local attorneys practicing in this district had an occasion to meet him.

Given the timing of defendants' request, it is not illogical to think that what has prompted this particular attack is nothing other than their desire to protract the litigation because of the possibility that the case has been proceeding faster and smoother than they had anticipated, but also because of some highly contested legal issues that have surfaced or have become ripe for the Court's ruling within the past weeks.

## DUE PROCESS

With the distinct tone of an afterthought, movants tack on a single paragraph at the end of their memorandum stating that "[a]lthough unnecessary to reach the issue since recusal is clearly mandated by section 455, the Judge's refusal to disqualify himself in the present circumstances would run afoul of the due process clause of the United States Constitution." Defendants' Memorandum at 19. No specific citation to the Constitution is made and there is no discussion of what factual or procedural basis there is in this case for the alleged constitutional violation. Rather, with a short string of case citations, parentheticals and quotations, movants speak elliptically of "nice, clear and true" balances and unfairness. This hardly suffices to present a constitutional question and, in any case, we need not address the merits of the matter, should these be somehow adequately presented, since we have disposed of the recusal issue on other grounds. It is text book law that federal courts are required to decide issues on *non*-constitutional grounds whenever possible.[34]

## CONCLUSION

Half of the defendants in the current trial phase (representing less than 20 percent of all the defendants sued in this litigation) have requested that this judge and two of his law clerks be disqualified, and that the case, now in its third year, be dissolved. Their reason: an alleged concern over a professed appearance of impropriety caused by the fact that these law clerks have brothers who work for law firms engaged in this litigation.

Caribbean Woodwork—Francisco Santiago (8/13/87)
Multiplastics—Luis A. Marini Roig (10/19/87)
Fernandez & Gutierrez—Jose A. Hdz. Polo (10/16/87)
Caribbean Woodwork—Robert Hambleton (10/14/87)

**31.** Eric Tulla states in his affidavit that he heard at the August 7, 1989 conference that there is "a third Graffam brother who is also an attorney and who works with Charles Cordero, Esq." (para. 5).

**32.** American International Insurance Co. of P.R. and Insurance Company of the State of Pennsylvania.

**33.** See for instance the transcript cover/front pages for the following depositions submitted in Exh. G to the PSC's opposition:

**34.** *See generally* Nowak, John E. *Constitutional Law* 2nd ed. pp. 93–95 (West 1983).

Movants try to step lightly around the fissures of their petition for recusal. The motion itself is procedurally flawed insofar as many of the defendants' counsel did not provide supporting affidavits. Be that as it may, the Court has seriously considered their claims in light of the relevant law, all the facts, the nature of the case and its timeliness. The sum of these parts weigh heavily against the draconian request made by moving defendants. It is further compounded by the extreme prejudice that would befall all other parties in this case, both plaintiffs and defendants, and the ponderous burden that would be thrown upon the judicial system were this enormous and costly case to begin anew. *See Simonson*, 425 F.Supp. 574, at 577 ("we are sensitive to the burdens which our recusal, and the consequent reassignment of the case, would place upon our colleagues in this district, particularly with the matter so close to trial.")

Finally, movants' assertion that they did not know about the underlying facts to their motion is not convincing and is undermined by the fact that they waited for the proceedings to be substantially advanced before they made their move. Even if we were to think that this was done within the "good faith zeal of advocacy ... in the factual situation here presented by them, mandating disqualification would be nothing more than giving to these litigants a second opportunity to try a case before a different judge without their being entitled to that opportunity." *Miller Industries, Inc. v. Caterpillar Tractor Co.*, 516 F.Supp. 84, 89 (S.D.Ala.1980). In the end, it seems clear that the fear expressed by the moving defendants is not for the safeguarding of the integrity of the Court or unfair bias in the proceedings, but rather over a trial stratagem gone awry. This is plainly not enough to prevent the undersigned from continuing with the fair and speedy resolution of this trial.

Based on the foregoing, the Defendants' Motion for Disqualification, Recusal and Mistrial, docket No. 12237, is hereby denied.

The Court, having disposed of the issue of recusal by way of this Order, hereby finds that there is no need to continue this matter under a confidentiality order. Accordingly, the following documents shall be UNSEALED:

1. Documents that were to remain confidential and to be viewed *only* by the parties and their counsel pursuant to our Court Margin Order No. 506, (Docket No. 12287, filed August 17, 1989);[35] including the transcript of the August 7, 1989 Hearing in Chambers.

2. Court Margin Order No. 511 (Docket No. 12388, filed August 22, 1989).

3. Documents regarding this issue filed thereafter.[36]

IT IS SO ORDERED.

### APPENDIX A

1. Aconi·Constructors, Inc.
2. ADT Diversified Services, Inc.
3. Alexander & Alexander
4. Allied–Signal, Inc.
5. Amoco Fabrics & Fibers Co.
6. BASF Corp.
7. Crain Western, Inc.
8. Collins & Aikman Corp.
9. Honeywell, Inc.
10. Santa Fe Extruders, Inc.
11. Jack Lenor Larsen, Inc.
12. Foss Manufacturing, Inc.
13. Navan Carpets
14. Recticel Foam Corporation
15. Shelby–Williams, Inc.
16. Hytex Industries, Inc.
17. Johnson Controls
18. Dan River, Inc.
19. Dow Chemical Co.
20. Drexel Heritage
21. E.I. DuPont De Nemours Co.
22. Firestone Tire & Rubber Co.

---

**35.** Docket Nos. 12143, (filed August 8, 1989); 12233, 12234, 12235, 12236 and 12237 (filed August 14, 1989); and 12261, filed August 16, 1989.

**36.** Allied Signal, et al. ... (Docket No. 12323, filed August 17, 1989).

23. Forms & Surfaces, Inc.
24. H.B. Fuller Co.
25. H.B. Fuller Co. of Puerto Rico
26. Future Foam, Inc.
27. Glidden Industries of Puerto Rico
28. Goodyear Tire and Rubber Co.
29. Hufcor, Inc.
30. Knoll International (Scotfoam, General Felt)
31. Lamin–Art, Inc.
32. Laminating Services, Inc.
33. Lee Foam Products Co.
34. Maharam Fabric, Inc.
35. Olin Corp.
36. Otis Elevator Corp.
37. Union Carbide Corp.
38. Uniroyal, Inc.
39. Universal Security Advisors, Inc.
40. Wolf–Gordon